S. Robert Glassford v. Commissioner, John W. Hansen and Anna M. Hansen v. Commissioner, Samuel L. Lewis, Jr. v. Commissioner, Harold T Ward and Sara L. Ward v. Commissioner, Philip Y. DeNormandie v. Commissioner.
S. Glassford v. John W. Hansen & Anna M. Hansen
Docket Nos. 5473, 5474, 5475, 5910, 5958.
United States Tax Court
1945 Tax Ct. Memo LEXIS 126; 4 T.C.M. (CCH) 773; T.C.M. (RIA) 45251; June 30, 1945
*126 Daniel B. Priest, Esq., 15 Broad St., New York 5, N. Y., for the petitioners. Robert S. Garnett, Esq., for the respondent. DISNEY
Memorandum Opinion DISNEY, Judge: The above-entitled cases, duly consolidated for hearing, involve deficiencies in income tax for the calendar year 1940, as follows: Docket
De-
Number
ficiency
S. Robert Glassford
5474
$8,700.77
John W. Hansen and Anna
M. Hansen
5475
439.56
Samuel L. Lewis, Jr.
5473
96.07
Harold T. Ward and Sara L.
Ward
5958
872.60
Philip Y. DeNormandie
5910
5,906.82
The question presented is whether the petitioners received certain income in partial liquidation or pursuant to a bona fide plan specifying a time limit for complete liquidation of a corporation in which they were stockholders. Stipulations of fact were filed and we adopt them by reference and find the facts therein set forth. So much thereof as considered necessary to examination of the question will be set forth herein, together with further facts found from evidence adduced. [The Facts] The petitioners were stockholders of Bliss Fabyan & Co., Inc., a corporation organized under the law of Massachusetts *127 in 1927. The only stock issued by it was 5,000 shares of common stock. Its business was that of acting as selling agent and factor for certain textile mills. Its principal office was in New York City. In the latter part of 1939 the principal officers, directors and stockholders, because changed conditions in the cotton goods market made it apparent that the business was no longer profitable, determined that it would be advisable to liquidate. Counsel was consulted by some of the officers, and he submitted to them a document which was discussed by some of the officers, directors, and stockholders, though never formally approved or adopted at any meeting. Therein counsel stated, in pertinent part, the manner in which he suggested that the corporation be wound up and dissolved; that in his discussions with two of the interested parties, he had been advised that it was of no particular importance that dissolution should be voted in 1939, and it seemed just as well to have any action on dissolution to await the year 1940; that he advised that early in January 1940 a stockholders' meeting be called to act on the proposition that the company retire from business and be dissolved, the meeting *128 to be held about the middle of January, though the next annual meeting of stockholders had been set for March 7, 1940; that if the proposition should be approved by the holders of a majority of the outstanding capital stock, steps would be instituted promptly for the termination of leases and of the factoring and exclusive sales agreements of the company with the various mills, and the adjustment of accounts and final arrangements as to pension trusts; that in fact the factoring and exclusive sales agreements with some companies would terminate early in February 1940, and the others would require from 30 days to three months for termination, and the lease on the New York office could be terminated on April 30, 1940; that within three months after the stockholders vote to dissolve, the company could be substantially retired from the business and substantially all liabilities paid, and though there might be some necessary adjustment of accounts, the company would then, under Massachusetts law, file with the Commissioner of Corporations and Taxation a copy of the resolution to retire and dissolve, and request the Commissioner to apply for dissolution to the Supreme Judicial Court; that *129 the matter had been discussed with the Commissioner, and he had stated that he would take prompt action upon receipt of the certified copy of the resolution; that no great amount would have to be set aside pending final determination of tax liabilities, and distribution to stockholders of substantially all of their distributive share in the corporation's assets could readily take place early in 1940; that there was possibility, however, that the company might make a substantial recoupment from the Federal Government on account of processing taxes, and if so, these could be the subject of a further liquidating dividend; that generally speaking, if not in all cases, the stockholders would realize a gain in the liquidation, and that it might be to the substantial interest of some, should the liquidation take place pursuant to a plan adopted by the directors providing for slow liquidation, if they were thereby permitted for Federal income tax purposes to spread the gain over more than one year; that Mr. Black is going into that phase of the matter and a Mr. Priest, in preparing a memorandum on income tax aspects of the dissolution, will include the consideration of a slow liquidation. *130 On December 18, 1939, a special directors' meeting was held at the corporation's office in New York City, at which it was "RESOLVED: that this Board of Directors deems it advisable that Bliss Fabyan & Co. Inc. discontinue business and be dissolved"; that a special meeting of stockholders be held in Boston on January 18, 1940, to vote upon that proposition; and if duly voted that it do so, to authorize filing of a petition for dissolution in the Supreme Judicial Court of Massachusetts. Such meeting was held on January 18, 1940, by the stockholders, and a like resolution passed by them. On February 5, 1940, the majority of the directors certified to the Commissioner of Corporations and Taxation of Massachusetts that the corporation had discontinued business and had requested him to apply to the Supreme Judicial Court for dissolution. On February 7, 1940, a special meeting of the board of directors held in New York City voted to change the principal office from New York City to Montclair, New Jersey, and Mr. Black, treasurer, discussed informally the steps that were being taken on the advice of counsel to terminate the affairs of the corporation. The corporation withdrew from the *131 States of New York and Illinois early in February 1940. On March 1, 1940, the president, petitioner Glassford, addressed a letter to the stockholders stating, among other things, that it had been the objective of the management to liquidate the business and to return to stockholders about $73 a share, and that notwithstanding disruption of the previous year "and the contingent liabilities attaching to dissolution, we now believe, barring the unforeseen, that this may be accomplished. The task at the moment is to complete contractual responsibilities to the mills for whom we have acted as agents. * * * There exists the threat of considerable loss in liquidating certain receivables. We intend to exercise the utmost care and intelligence to avoid losses. Expenses have been drastically curtailed, all leases and other commitments have been cancelled or greatly reduced. Services of 112 out of 158 employed in 1939 have been terminated, including sales, office personnel and officers. * * * Counsel advises us, and it seems the best procedure, to effect liquidation as quickly as possible." The officers commenced reducing to cash the accounts receivable and other assets. On July 2, 1940, a *132 distribution of $60 per share was authorized by a meeting of the board of directors, and on the same date a letter went out calling for the forwarding of certificates so that such distribution could be endorsed by all. The letter states, "The liquidation continues quite satisfactorily. It is anticipated that in the early fall another distribution can safely be made." The stockholders on July 2, received the distribution of $60 per share. On October 18, 1940, another special meeting of the directors was held. The treasurer reported to the meeting "on the progress being made in liquidating the affairs of the Corporation," and it was voted to pay a second distribution of $10 per share on October 23, 1940. Payment of the $10 per share was made to the stockholders on October 23, 1940. Another letter, dated October 21, 1940, calling for forwarding of the certificates for purposes of endorsement of the payment of the distribution, stated in part, "The liquidation continues satisfactorily. It is anticipated that a small additional distribution will be made before the end of the current year." On November 19, 1940, a special meeting of the board of directors approved termination of the corporation's *133 pension trust because it was stated all remaining policies had been liquidated or assigned to the insured employees, and because with the liquidation of the corporation the pension trust was no longer necessary. On December 17, 1940, a special meeting of the board of directors authorized the treasurer to transfer 5,000 shares of Northern New England Co. stock held by the corporation, share for share, to the holders of the 5,000 shares of Bliss Fabyan & Co., Inc., and "having reviewed the status of the liquidation, and following the advice of counsel," set aside $3,009.51 as a reserve to cover all known liabilities and remaining anticipated expenses, and resolved to make a final distribution of the balance, $26,500, to the stockholders at $5.30 per share. The remaining assets, consisting of cash and stock of Northern New England Co., were distributed ratably to the stockholders of record on December 27, 1940, and all stock was canceled. On December 27, 1940, the president of the corporation issued a letter to the stockholders, in which he referred to his letter of March 1, 1940, in which he had stated that the objective was to liquidate the business as quickly as possible, exercising *134 the utmost care and intelligence to avoid losses and to provide the stockholders with $73 per share. He was pleased to report that objective accomplished, and stated that the stockholders had already received $70 per share, and that after payment of all known liabilities and indebtedness, there remained for final distribution $5.30 per share, in addition to one share of Northern New England Co. stock for each share of Bliss Fabyan stock; and he requested that all stock be forwarded for surrender and cancellation, after which final check would be mailed together with the Northern New England Co. stock. The following table shows, as to the respective petitioners, the number of shares and date of acquisition of stock in Bliss Fabyan & Co., Inc., cost, amount received in liquidation, profit, amount reported as income, and determination by the Commissioner: Amount
No.
Received
Shares
Date
on Liqui-
Gain on
Held
Acquired
Cost
dation
Exchange
Glassford
145
Oct. 11, 1939
$9,666.67
$11,136.00
$ 1,469.33
Glassford
510
Prior to 1-1-38
1,062.82
39,168.00
38,105.18
Hansen
30
Oct. 11, 1939
2,000.00
2,304.00
304.00
Hansen
110
Prior to 7-14-37
2,825.75
8,448.00
5,622.25
Lewis
20
Oct. 11, 1939
1,333.33
1,536.00
202.67
Lewis
50
2-14-33 to 7-13-37
3,065.70
3,840.00
774.30
Ward
200
Prior to 1-1-37
2,641.00
15,360.00
12,719.00
Ward
25
Dec. 27, 1938 to
Dec. 27, 1940
1,666.67
1,920.00
253.33
DeNormandie
300
Prior to 1-1-37
3,350.00
23,040.00
19,696.00
*135 No.
Shares
Amount
Determination
Held
Reported
by Commissioner
Glassford
145
$1,469.33
All gain held
Glassford
510
19,052.59
Short-term
Capital gain
Hansen
30
304.00
All gain held
Hansen
110
2,811.12
Short-term
Capital gain
Held to be Short-
term Capital Gain
of $1,294.47 on 45
shares and a loss
Lewis
20
202.67
of $317.50 on 25
Lewis
50
387.15
Shares a Net
Short-term Cap-
ital Gain of
$1,135.72
Ward
200
6,359.50
All gain held
Ward
25
Short-term
253.33
Capital gain
All gain held
DeNormandle
300
9,845.00
Short-term
Capital gain
In addition to the facts stipulated and above epitomized, we further find from the evidence as follows: That Bliss Fabyan & Co., Inc., was advised about November 1939 that the largest group of mills with which it held selling contracts had decided to set up their own selling agency. Similar withdrawals had occurred in two or three previous years. It was therefore decided to dissolve the business and the first step taken was to cancel the agency contracts with the remaining mills. Most of the contracts *136 provided termination clauses effective from 30 to 90 days. Under date of February 6, 1940, Bliss Fabyan & Co., Inc., filed with the Commissioner of Internal Revenue on Form 966 a report showing that on January 18, 1940, there had been adoption of a resolution or plan of distribution or liquidation, a copy of which resolution was attached. Receipt was acknowledged by the Commissioner of Internal Revenue. The assets of the company were chiefly accounts receivable, a small amount of office equipment, furniture, typewriters, etc. Ninety days was the longest period required for the disposition of any contract. The lease upon the corporation's office expired on April 30, 1940, but prior to that date the office, books and records were removed to Montclair, New Jersey. The corporation stopped taking orders early in February 1940. After that the procedure was to wait the filling of previous orders, make the billings to customers, make collections, turn the money over to the mills for which the corporation acted as agent, and collect the commission. Anticipating the termination of the business, a start was made in 1939 to release employees. In that year there were about 158 people in *137 the organization, but by November this had been reduced by 132; by March 1, 1940, to 46; by April 20, 1940, to 31; by May 18, 1940, to 7; and about the middle of the year there were no employees, and all business, so far as orders were concerned, had been concluded. The stock of Northern New England Co. which was distributed, was valued at about $1.25 to $1.50 a share. The office equipment was sold as rapidly as possible, beginning in November 1939, and the proceeds were included in the distributions made. The corporation was not engaged in any litigation. The stockholders figured that the business and assets could be cleaned up within three or four months. Practically all of them were going into the employ of the mills that had cancelled contracts with Bliss Fabyan & Co., Inc. Bliss Fabyan & Co., Inc., filed income and declared value excess profits tax returns for the calendar years 1941 and 1942. For 1941, it reported $1,232.71 income, of which $730.26 was "Commission," and $502.45 insurance refund and sale of furniture. Expenses for the year were $1,257.53, $1,250 being for "Additional legal and administrative expense." In answer to the question as to whether the company owned *138 at any time during the taxable year 50 per cent or more of the voting stock of another corporation, either domestic or foreign, the answer "No," was given. Cash on hand at the end of the year was reported in the amount of $3,195.94. The return for the year 1942 reported total income of $20,088.38, of which $9,630 was "Interest on loans, notes, mortgages, bonds, bank deposits, etc.," $10,079.50 was "Unexpected bad debt recoveries," and other items were furniture sale $103.30, abatement of Massachusetts tax $86.03, and $186.75 sale of records and papers as waste. The statement was made that the corporation had terminated all activities, and its books and records placed with an attorney in New York City. Cash reported on hand at the end of the year was $7,376.56, notes and accounts receivable $5,030, and earned surplus and undivided profits $11,500; and $10,000 was reported as a "Distribution in Liquidation" during the year. The answer to the question as to whether the corporation owned at any time during the taxable year 50 per cent or more of the voting stock of another corporation, either domestic or foreign, was "Yes," with explanation that the corporation owned 100 per cent of the *139 stock of Cotton Textile Management Corporation, that it had been acquired in December 1933, and that return of the income of such corporation for the last taxable year had been made to the Custom House of New York. Were the distributions, made within the taxable year, made in complete liquidation? This depends upon whether, under section 115 (c) of the Internal Revenue Code, they were made * * * in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding, from the close of the taxable year during which is made the first of the series of distributions under the plan, * * * three years, * * * It is not contended that there was here a plan specifying a certain date prior to which the distribution should be completed; but the petitioners' contention is, in substance, that it was the expectation and plan, under all the circumstances, to complete the distribution as quickly as possible, and within a comparatively short time, and that such a plan is compliance with the statute. We have held, in John R. Roach, 4 T.C. 1255, *140 that where there was a plan to complete distribution immediately, followed by completion within the threeyear period, a plan fixing a time had been demonstrated, and the statute was satisfied. Here, though no definite date was set for liquidation, the advice of counsel was to the officers, and it seemed to the president the best procedure, "to effect liquidation as quickly as possible." This is referred to in letters of the president to the stockholders, both on March 1, 1940, and December 27, 1940. It was also suggested that within three months after stockholders voted to dissolve, the corporation could be substantially retired from business and substantially all liabilities paid. This plan was followed out, for the business was closed out, office furniture sold, the corporation withdrew from the states where it was qualified, and, before the year was out, except for about $3,000, "The remaining assets, consisting of cash and stock of Northern New England Company were distributed ratably * * *." These facts plainly indicate a plan to act promptly to close the corporation out and, in our opinion, bring the case well within the principle announced in the Roach case, supra. The respondent *141 points out, however, that there was income in 1941 and 1942. The amount in 1941 was small, $1,232.71, and can not be considered material. He also relies upon the fact of $20,088.38 income in 1942, and a distribution of $10,000 in that year. The income amounted to about $4 per share upon the 5,000 shares of stock, and, considering the size of the corporate business, appears no unreasonable amount of belated recoveries. It is explained as unexpected bad debt recoveries to the extent of $10,079.50, $103.30 on sale of "Furniture Realization," $186.75 sale of records and papers, and $86.03 abatement of Massachusetts tax. The $10,079.50, unexpectedly received, is entirely consistent with a bona fide plan in 1940 to liquidate, and the others indicate actual closing up of business. It is true that $9,630 is reported as "Interest on loans, notes, mortgages, bonds, bank deposits, etc.," but no reliance is placed by the respondent on this item as indicating income upon property still retained. Nor is any reliance placed upon, or mention made of, the fact of ownership of stock in Cotton Textile Management Corporation. In our opinion, there was a plan to liquidate as quickly as possible, followed *142 within the year by closure of all business and transfer of practically all money and assets, and cancellation of all stock. We hold that there was a bona fide plan of liquidation, under which transfer of the property of the corporation was to be completed within a time specified in the plan, within three years, and that the distributions were made in complete liquidation; therefore, that the Commissioner erred in treating the amounts received by the petitioners as stockholders as received in partial liquidation. Decision will be entered under Rule 50 in Docket Nos. 5474, 5958, 5910, and for petitioners in Docket Nos. 5473, and 5475.